

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>SCOTT MICHAEL DANIELS,<br><br>Defendant. | MJ 20- 37 -M-KLD<br><br>AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT |

The undersigned, Trevor Hare, affiant being duly sworn states:

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since September 2014. I served five years as an FBI Special Agent within the FBI's Salt Lake Division, Lewiston Resident Agency, and have served in the FBI's Salt Lake Division, Kalispell Resident Agency, since April 2020. As part of my law enforcement duties, I am statutorily charged with investigating federal criminal violations. As a Federal Agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States. I have been an investigative case agent involving federal law violations including homicide, kidnapping, assault, assault on a federal officer, firearms offenses, sexual assault, child abuse, strangulation, narcotics offenses, and financial crimes. In the course of these investigations, I

have obtained and executed search warrants and arrest warrants. In the course of these investigations, I have obtained and executed search warrants and arrest warrants, conducted surveillance, interviews, and employed consensually monitored confidential informants.

2. As a Special Agent of the FBI, I have had training and experience dealing with multiple criminal investigations involving the sale and distribution of illegal narcotics. From these investigations, I have had the opportunity to interview numerous individuals involved in narcotics trafficking concerning the various methods by which they operate, to include their use of coded language and the avoidance of specific references to narcotics, and their practice of conducting most of their transactions in cash to avoid leaving a paper trail of their narcotics purchases, sales, and proceeds. I have also learned that narcotics traffickers at the higher levels of the drug trafficking hierarchy tend to avoid or minimize their possession of narcotics to avoid apprehension by law enforcement and that these high level narcotics traffickers tend to operate through intermediaries and "runners" to further minimize their own exposure. In addition, I have learned the measures that narcotics traffickers use to avoid law enforcement surveillance and investigations, such as the development and use of aliases; the use of internet-based mobile telephone applications to avoid electronic surveillance; and the use of

counter-surveillance driving techniques to avoid being followed by law enforcement.

3. In addition, based on my training and experience, as well as my involvement in this and other investigations, and conversations with other experienced law enforcement officers, I know:

a. That narcotics traffickers often maintain on hand large amounts of U.S. currency as narcotics proceeds, to maintain or finance their ongoing narcotics business;

b. That narcotics traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, cashier check receipts, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances, even though such documents may be in code; That narcotics traffickers commonly "front" narcotics (provide controlled substances on consignment) to their clients, and that records are maintained by such narcotics dealers so they can account for their narcotics and the monies owed for these illegal narcotics; That the aforementioned books, records, receipts, notes, ledgers, etc., are commonly maintained where narcotics traffickers have ready access to them, including but not limited to residences, offices, vehicles, cell phones, and storage places;

c. That it is common for narcotics dealers to secret contraband, proceeds of narcotics sales and/or records of narcotics transactions, narcotics sources, and narcotics customers in secure locations within residences, businesses, offices, garages, storage buildings, safes, vaults, safe deposit boxes, vehicles, and obscure locations such as storage containers buried underground, in order to conceal such items from law enforcement authorities;

d. That persons involved in narcotics trafficking conceal caches of narcotics, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of narcotics transactions, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending of large sums of money made from engaging in narcotics trafficking activities in their residences, businesses, offices, garages, storage buildings, safes, vaults, safe deposit boxes and/or vehicles;

e. That narcotics traffickers commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses, and/or telephone numbers for their associates in the narcotics trafficking organization, even if said items may be in code, and that these types

    of records are sometimes maintained in computers or other electronic data storage devices;

f.  That narcotics traffickers frequently take or cause to be taken, photographs and/or videos of themselves, their co-conspirators and associates, their property, and their product, and that these traffickers usually maintain these photographs and/or videos, in their residences, offices, or other places under their control;

g.  That narcotics traffickers often keep paraphernalia for packaging, cutting, weighing, manufacturing, and distributing controlled substances, and that such paraphernalia often includes, but is not limited to scales, plastic wrap, plastic bags, vacuum sealers, and aromatic substances such as soap, dryer sheets, wood shavings, heat sealers, and plastic wrapping, etc., which are used to mask the odor of illegal narcotics in an attempt to avoid detection by drug detection dogs;

h.  That it is common for narcotics dealers to deal/possess weapons (firearms), including stolen weapons or other stolen goods and exchange narcotics for such weapons or goods, and these weapons are commonly used by narcotics dealers as an item of investment and for protection from robberies by other narcotics dealers;

i. That when narcotics dealers collect proceeds for the sale of illegal narcotics, they often attempt to legitimize these profits. Further, that to accomplish this goal, drug traffickers use sources, including but not limited to, foreign and domestic banks and their attendant services, cashier's checks, money orders, wire transfers, and bank drafts;

j. That narcotics traffickers commonly utilize telephones, both residential and cellular, and as a means of communications to conduct their trafficking "business";

k. That narcotics dealers often purchase expensive vehicles, businesses, and residences with the proceeds from their drug transactions, and that they often keep these items registered in the names of other trusted individuals in order to avoid discovery by law enforcement;

l. That the courts have recognized that unexplained wealth is probative evidence of crime motivated by greed, in particular, trafficking in controlled substances;

m. That individuals and businesses involved in the illegal distribution of controlled substances often use computer equipment to document and track their business affairs, including their illicit sales and disposition of the proceeds of their sales;

  n. That there are many reasons why criminal offenders maintain evidence for long periods of time. The evidence may be innocuous at first glance (e.g. financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, telephone bills, keys to safe deposit boxes, hardware and software computers), but have significance and relevance when considered in light of other evidence. The evidence may be highly valuable to the offender, and at the same time be of usefulness for evidentiary purposes, such as valuable investments (e.g. art, jewelry, precious metals and stones, real estate, securities), large sums of currency, drug or money laundering ledgers, safes, customer lists, firearms, communications equipment, vehicles, airplanes, vessels, computers, counter surveillance equipment, scales and packaging equipment.

4. With my experience as an investigator, I have found that illegal narcotics trafficking is often a long term, continuing activity. Illegal narcotics traffickers will repeatedly obtain or manufacture and then distribute controlled substances on a somewhat regular basis, such as any distributor of a legitimate

commodity would purchase stock, and similarly such narcotics traffickers will have an "inventory" which will fluctuate in size depending upon the demand for the product. Certain types of drug paraphernalia, such as scales for use in weighing amounts of narcotics at the time of purchase, plastic wrap and plastic bags for packaging narcotics for distribution and/or transportation, are often kept by a trafficker on an essentially continuous basis for use whenever needed. Further, that traffickers keep records of their illegal activities for months or years beyond the time during which they actually possess illegal narcotics, in order to maintain contact with their criminal co-conspirators and associates for future transactions, and so that they have records of prior transactions for which, for example, they might still be owed money, or might owe someone else money; and drug traffickers often use the narcotics that they traffic and manufacture and/or other narcotics, and it is not unusual to find personal use quantities of narcotics and paraphernalia consistent with the use of these substances on their persons and on their property.

5. In late May 2020, FBI SA Trevor Hare and Flathead County Sheriff's Detective Jeff Perry learned from a confidential source (CS1) that Scott Daniels possessed stolen firearms. CS1 told them on June 14, 2020, that CS1 and other people transported numerous stolen vehicles from the Kalispell area to Spokane and traded them for illegal drugs. When the drug trade was drying up, CS1 and

Daniels found a drug supplier together. CS1 stated Daniels stole guns from CS1 and other people. CS1 also sold guns with Daniels.

6. On September 11, 202, DEA SA Kevin Evans and SA Hare interviewed CS2. CS2 stated Daniels recieved approximately 12 pounds of methamphetamine in mid-August 2020. CS2 identified Daniels as the biggest drug dealer in the Flathead valley.

7. On September 22, 2020, CS2 told SA Evans and SA Hare that CS2 observed Daniels with a big Ziploc bag of meth in Daniels' detached garage on Silverleaf Drive in the last half of September 2020. CS2 has purchased methamphetamine from Daniels four times since July 2020. CS2 has purchased approximately 2.25 ounces of methamphetamine from Daniels. CS2 has observed Daniels sell drugs to other people in the detached garage.

8. SA Hare and Northwest Montana Drug Task Force (NWMDTF) Agent Dave Rehbein interviewed CS3 in late September 2020. CS3 stated that Daniels told CS3 he made more than $60,000 in the month of June. CS3 saw Daniels with approximately three pounds of methamphetamine in his detached garage. CS3 saw Daniels with just under three pounds of methamphetamine in the beginning of July 2020. CS3 has observed Daniels distributing methamphetamine.

9. On September 30, 2020, agents from FBI executed a search warrant issued by the United States District Court for the District of Montana, on Daniels' residence at 79 Silverleaf Drive, Kalispell, Montana.

10. Agents recovered:

   a. Six rifles (two assault rifles), one assault shotgun, and two handguns;

   b. A small quantity of suspected methamphetamine;

   c. A small quantity of suspected heroin;

   d. Numerous items of drug paraphernalia;

   e. Six digital scales;

   f. Numerous unused small baggies commonly used for the distribution of controlled substances.

11. One rifle that was recovered had been stolen from a residence in Kalispell on July 8, 2020. Agents recovered a Ruger rifle that was 27" long and appeared to have the stock removed.

12. FBI SA Monte Shaide and FBI TFO Guy Baker interviewed Daniels. Daniels admitted distributing between 49-60 ounces of methamphetamine between spring 2020 and fall 2020. Daniels stated he would buy methamphetamine for around $600-$700 per ounce and then sell it in smaller quantities.

13. Daniels stated that he relapsed and began using methamphetamine around the beginning of 2020. He began distributing to support his drug use.

14. Daniels stated that he purchased the firearm that was identified as stolen and did not know it was stolen.

15. Based on the foregoing, I submit that there is probable cause to believe that on or about and between Spring 2020 and September 30, 2020, Scott Daniels committed the offenses of Possession with Intent to Distribute Controlled Substances, in violation of Title 21 U.S.C. § 841(a)(1), and Drug User in Possession of Firearms, in violation of 18 U.S.C. § 922(g)(3).

Trevor Hare, Affiant
Special Agent, FBI

Based on the Affidavit sworn to before me, and subscribed in my presence, the Court hereby finds that there is probable cause to believe there is evidence of the offenses set forth in the affidavit.

DATED this 30th day of September, 2020.

Kathleen L. DeSoto
United States Magistrate Judge